IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                Plaintiff

v.

EDGAR MIRANDA,

                Defendant.

REPORT AND
RECOMMENDATION

08-cr-76-bbc
_____

## REPORT

The grand jury has charged defendant Edgar Miranda with conspiring to traffic in powder cocaine with Fidel Holguin and others. *See* dkt. 2.[1] Before the court for recommendation are Miranda's motion to suppress telephonic conversations intercepted on a government wiretap of Holguin's telephones (dkt. 19) and his motion to suppress his post-arrest statements (dkt. 20). For the reasons stated below, I am recommending that the court deny both motions.

I. The Government's Wiretaps

The government's primary target in this investigation was Holguin, and it obtained a series of court- authorized wiretaps for telephones he was using. Holguin is heard speaking to Miranda in some of the intercepted calls. Miranda has moved to quash the pertinent wiretaps on the ground that they did not meet the statutory requirement of necessity. Miranda argues that the government had sufficient information from other sources and could have obtained whatever other evidence it needed through other investigative sources without resorting to a highly-intrusive wiretap. The government disagrees.

The government has submitted a copy of FBI Agent Todd Brookhiser's affidavit in support of the challenged wiretap application. *See* brief in opposition, doc. 41. This affidavit

---

[1] The grand jury separately indicted Holguin and two other defendants in Case No. 08-cr-75-bbc. Holguin already has pled guilty and been sentenced.

speaks for itself; by way of brief overview, the telephones to be intercepted belonged to Holguin and his wife. The application named 12 targets by name as suspected members of the alleged cocaine trafficking conspiracy. This was the second set of Title III intercepts used in this investigation: on February 19, 2008 this court had approved the first request to intercept a different telephone subscribed to by Holguin. As is clear from the affidavit, this first wiretap was a rich source of information, much of which was corroborated by informants and surveillance. So why tap these other two telephones?

Agent Brookhiser's affidavit reported that the two other target phones were being used by alleged co-conspirators as part of their drug trafficking operation. Court-ordered pen registers corroborated regular calls to and from the two additional telephones sought to be taped. At page 29 of his affidavit, Agent Brookhiser contended that new wiretaps were necessary in order to obtain sufficient evidence to prove the alleged conspiracy and the participation of the conspirators beyond a reasonable doubt, and that ordinary investigative technics were not sufficient by themselves. For instance, five informants were working actively for the government, but they could not provide information regarding all of the alleged co-conspirators. The agents attempted to insert an undercover agent into the investigation, but this roused Holguin's suspicions to the point that he no longer used Target Telephone Number 1 in his operations. Interviews of the cooperating witnesses had exhausted their knowledge without identifying all of the suspected co-conspirators. The police did not have probable cause to search any particular location for drug evidence. The pen registers and toll records, while useful as far as they went, only revealed the fact of contact between suspects; they did not reveal the contents of those conversations. Physical surveillance had been used successfully but had limits. As Agent

Brookhiser stated, based on the shear number of calls made to and from Target Telephones 2 and 3 and other telephone numbers associated with the organization, physical surveillance would not reveal the scope of the organization, including the sources of supply and the organization's hierarchy.  Trash picks had been attempted but were generally unsuccessful because of Holguin's habit of putting out his trash the morning of pickup; in any event, trashpicks would not have provided a great deal of useful information.

Agent Brookhiser's report provides enough information to meet the requirements of 18 U.S.C. § 2518 (1)(c), often deemed the exhaustion or necessity requirement.  The statute does not require a showing of absolute necessity; it does it require that any other investigative procedure be tried first before an order can issue allowing interception of communications; nor does it require that a wiretap be used only as a last resort.  *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008).  The statute requires only that other methods of investigation appear to be unlikely to succeed or too dangerous to attempt.  The government's burden of proving necessity is not great, and its compliance with the necessity requirement is reviewed in a practical and common sense fashion.  *Id.*  Even where normal investigative technics are working well, a wiretap may be necessary to identify all co-conspirators at all levels of the drug conspiracy.  *Id* at 748.  Even where the government might have enough evidence successfully to prosecute its case, using a wiretap to obtain additional evidence is not problematic: "[a]fter all, the government's burden of proof at trial is substantially higher than its burden in obtaining an indictment. And the government [is] entitled to attempt to identify the full extent of this organization and its operatives." *Id.*

3

Here, Agent Brookhiser's affidavit provides sufficient narrative detail and investigative chronology to support the court's finding that the requested secondary round of wiretaps was necessary. The requirements of § 2518(1)(c) were met in this case. Miranda's suggestion that there were several more particular investigative techniques that should have been employed before resort to a wiretap misinterprets what the statute actually requires of government. There is no basis to quash the challenged wiretap.

II.  Miranda's Post-Arrest Statements

On August 21, 2008, this court held an evidentiary hearing on this motion.  *See* transcript., dkt. 34.  Having heard and seen the witnesses testify and having considered the exhibits and other submissions, I find the following facts:

A. Facts

On May 14, 2008 the federal grand jury in this district returned its indictment again Edgar Miranda.  The court sealed the indictment and issued a warrant for Miranda's arrest.  At about 6:00 a.m. the next morning, May 15, 2008, task force agents arrested Miranda at his home in Beloit, Wisconsin.  Members of the Beloit Police Department (BPD) assisted with this arrest, including BPD Safe Streets Task Force Agent John McMahon.  About ten agents, including BPD's tactical team–in body armor and brandishing automatic weapons–rammed in the door to Miranda's apartment.  Miranda was found sleeping in a first-story room.  Agents allowed him to get dressed and arranged to drive him to the Beloit police station to attempt an interview.

FBI Agent Brad Woods and Task Force Agent McMahon transported Miranda to the Beloit Police Department for an interview before taking him to Madison for booking into federal court. During the short (5 minutes or less) car ride to the Beloit police station, the agents spoke with Miranda to determine that they had the right person and to determine how fluent Miranda was in English. Among other things, the agents asked Miranda for his birthdate (he was 27), how long he had been in the area and how long he had been working at his present employment. The agents concluded that they had a language barrier and would need an interpreter for their interview.

Upon arriving at the Beloit police station, the agents ensconced Miranda in a holding cell while they obtained an interpreter. Within about 20 minutes, ATF Special Agent William Boudhuin appeared to assist with the interview. Agent Boudhuin is sufficiently fluent in Spanish to interpret between English-speaking agents and Spanish-speaking defendants. The three agents met with Miranda in a small interview room. Agent Wood did most of the questioning, with Agent Boudhuin translating. Agent Wood started the interview by telling Miranda that they were going to play a tape of an intercepted telephone conversation between Miranda and Fidel Holguin. Agent Wood told Miranda not to say anything until after the tape had been played. Agent Wood then played the recording on his computer; the two-minute conversation between Miranda and Holguin was in Spanish.

Before Agent Wood asked Miranda any questions, Agent Boudhuin presented Miranda with a pre-printed Spanish language *Miranda* advisal and waiver form. Agent Boudhuin read the form aloud to Miranda. Miranda agreed to speak to the agents and signed the waiver. Agent Wood had not asked Miranda any substantive questions prior to Miranda waiving his Miranda

5

rights, nor had Miranda offered any statements in response to the recording of the telephone call prior to receiving and waiving his rights.

Miranda offered a relatively innocuous explanation of his conversation with Holguin: Miranda admitted that he was talking to Holguin about cocaine but asserted that they were talking about a two-gram deal and that the cocaine was for personal consumption. The agents, by their questioning, made clear their skepticism: they told Miranda that they believed he and Holguin were discussing a 2-ounce cocaine transaction and that Miranda planned to resell the cocaine. Miranda did not budge from his position, even when agents tried to induce cooperation by stating that if Miranda cooperated, he likely would receive favorable consideration from the prosecutor. The entire interview lasted about an hour. It was cordial and business-like at all times. The agents did not threaten Miranda. Miranda gave no verbal or behavioral indications that he did not understand what was happening or otherwise was physically, mentally or emotionally distressed.

### B.  Analysis

Miranda contends first that the agents' question-first/*Mirandize*-second tactic is precisely the danger that concerned the United States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). Miranda argues that the agents intended to soften him up by playing the tape before *Mirandizing* him, because they knew that if they *Mirandized* him first and he invoked his rights, then they would lose their opportunity to play the tape and to question him. Miranda also contends that regardless of *Siebert's* applicability to his interview, his post-arrest statement was

involuntary because the agents coerced it with overbearing tactics, including their forceful entry into his home and their interrogation tactics.

The government disputes every aspect of Miranda's argument, contending first that there was no police coercion, second that Miranda's will never was overborne, and third that there was no *Siebert* violation here.

It is the government's burden to establish by preponderance of the evidence the validity of a defendant's Miranda waiver and the voluntariness of his confession. *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008). It is a fact question whether the police deliberately used a two-step interrogation method designed to circumvent *Miranda*; where this is the case, the government bears the burden of proving the police did not deliberately withhold the warnings until after they had initial and inculpatory statement in hand. *Id.* What concerned the *Siebert* plurality was that "with one confession in hand before the warnings, the interrogator can count on getting its duplicate with trifling additional trouble." *Stewart*, 536 F.3d at 722, quoting *Siebert*, 542 U.S. at 613. Conversely, the lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent *Miranda*. *Stewart*, 536 F.3d at 722. *See also United States v. Peterson*, 414 F.3d 825, 828 (7th Cir. 2005) (agents did not violate *Miranda* or *Seibert* by presenting arrested defendant with a 50 minute overview of their evidence before providing warnings and beginning questioning).

Here, the agents did not engage in the two-step interview process outlawed by *Siebert*. The agents' pre-*Miranda* questioning of Miranda during transport was intended to elicit

background information. It had nothing to do with the actual drug investigation. Miranda's post-warning statements related to an entirely new topic, the allegedly incriminating telephone call between him and Holguin. Thus, the government is correct: *Siebert* does not apply directly to what actually occurred here.[2] To the same effect, based on what actually happened here, Miranda's kitchen-sink resort to *Brewer v. Williams*, 430 U.S. 387 (1977) is a non sequitur, even if the court assumes he meant to cite *Rhode Island v. Innis*, 446 U.S. 291 (1980)(the "functional equivalent of questioning" case). Miranda did not actually say anything until later, after being advised of his rights, signing a waiver and being subjected to actual questioning. Therefore, the agents' "softening-up" tactics will result in suppression only if they rendered Miranda's statements involuntary.

In reviewing the totality of circumstances as part of a voluntariness dispute, courts are to consider the suspect's age, intelligence and education; whether he was advised of his constitutional rights before making his incriminating statements; how long he had been detained before giving his consent; whether his consent was immediate or was prompted by repeated requests by the authorities; whether any physical coercion was used; and whether the defendant was in police custody. *See, e.g., United States v. Figueroa-Espana*, 511 F.3d 696, 7054 (7th Cir. 2007)(consent-to-search case); *see also United States v. LeShore*, 543 F.3d 935, 940 (7th Cir. 2008)(defendant claimed that intoxication rendered his statement involuntary).

---

[2] The agents ran the risk that Miranda would blurt out an incriminating statement during phase one, which might have tainted those statements and perhaps any other statements obtained that day, even after warnings were provided. *See Peterson*, 414 F.3d at 828. But this didn't happen.

In this case, a phalanx of heavily-armed agents literally broke into Miranda's home while he slept, and arrested him on a drug charge. Undoubtedly this was an unexpected and frightening occurrence; Miranda, however, had the opportunity to regain his composure during the ride to the police station and a 20-minute hiatus while the agents obtained an interpreter. Miranda certainly never verbalized or demonstrated any signs of physical or emotional distress that might have alerted the agents that his ability to exercise his free will might be compromised.

The agents began their interrogation by attempting to convince Miranda that they were "serious;" they did this by playing for Miranda a recording of a conversation he had had with Holguin that the agents were convinced involved a two-ounce cocaine deal. Miranda, however, would not buy into the agents' story, even when offered the inducement of consideration for cooperation. His unwavering interpretation of this phone call was significantly less inculpatory. Miranda received and waived his rights before speaking. The interview itself was cordial, conversational and relatively short, particularly taking into account translation time. Miranda was old enough, smart enough and composed enough to hold his own in the interrogation, as demonstrated by his persistent refusal to surrender his interpretation of the phone call for that urged by the agents. This is the antithesis of having one's will overborne. In short, Miranda's post-arrest statements were voluntary.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Edgar Miranda's motion to quash the wiretap and deny his motion to suppress his post-arrest statements.

Entered this 29th of December, 2008.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

December 29, 2008

David Reinhard
Assistant United States Attorney
660 West Washington Avenue, Ste. 303
Madison, WI 53703

Harvey A. Steinberg
Steinberg and Steinberg
1600 Broadway, Suite 1200
Denver, CO 80202

  Re: United States v. Edgar Miranda
    Case No. 08-cr-076-bbc

Dear Counsel:

  The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

  The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

  In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before January 12, 2009, by filing a memorandum with the court with a copy to opposing counsel.

  If no memorandum is received by January 12, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

           Sincerely,

           /s/ M. Hardin for
           Connie A. Korth
           Secretary to Magistrate Judge Crocker

Enclosures
cc: Honorable Barbara B. Crabb, District Judge

11

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:
  (1) injunctive relief;
  (2) judgment on the pleadings;
  (3) summary judgment;
  (4) to dismiss or quash an indictment or information;
  (5) to suppress evidence in a criminal case;
  (6) to dismiss or to permit maintenance of a class action;
  (7) to dismiss for failure to state a claim upon which relief can be granted;
  (8) to dismiss actions involuntarily; and
  (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* **462 F.3d 684, 688 (7th Cir. 2006).**